This is Auction Management Solutions v. Manheim Auctions, 2009-15-87. Mr. Gunner, in this auction case, are you buying or selling? Mr. Gunner, I'm hoping you're buying. Nevertheless, may it please the Court and good morning. There are many issues in this case, but except for the enablement and written description issues, which I think turn on questions of law, the questions are all whether or not there's substantial evidence to support the claim. We submit that there are substantial evidence issues that preclude summary judgment, and we further submit that the problem in this case is that the District Court focused almost completely on the evidence supporting Manheim and almost not at all on the evidence supporting AMS. Let me be more specific. I'm talking about the activities of May 24th, which was one day before the critical date. That's exactly right. And then two days later, after the critical date, the invention was ready for patenting because software had been inserted by someone with no more than normal skill, a student. Now, those are the facts. Your Honor, I disagree with your premise that he was no more than normal skill. Bill Gates was a student at Harvard when he dreamed up the idea of Microsoft. He's now the richest man in the world. He didn't invent the software, though. But this man, James, was not a normal person. He was of exceptional skill. He may have been young. He was not an inventor, though. He was not named, and he was not an inventor. So isn't it true, then, that he was functioning as simply a technician in effecting the software necessary to accomplish the goals that he truly set out? Your Honor, first of all, let me make one point. Juan's case points out that the time involved between an event and the ultimate success rate on the issue of undo experimentation is only one of eight factors. Another factor is predictability and various other factors. The predictability here was really low. James and his other colleagues had worked for one and a half years. Time after time, they had to prove they had to get a system that was not latent, that was not too latent, that is, that was fast and that was reliable. In order to do that, they had to have the proper network protocol. The SRD document had nothing in it about protocol. Can I just correct you so we can be more specific? In your brief, you say the jury could reasonably rely on the testimony of James and Speer that the precritical date software functioned in an unacceptable manner. By unacceptable manner, what do you mean? Is it your argument that there was – we have testimony that there was a difference between May 24th and May 26th in terms of the speed and reliability? Absolutely, Your Honor. So where's the best testimony of that? Because you refer us in the great brief back to the blue brief and it's four pages where there are an enormous number of citations to the record. So I guess I'm wondering. Well, the testimony is basically the May 24th demonstration did not work and the blue brief on 16 and 17 has all the cites on that. They worked all night long into the 25th, into the 26th, which is the final date of the paid auction. It was still not working because it was not reliable. The testimony is on blue, 16, 17, and 18. Mr. Durham, what about the appendix page 20281? Let me have a look. This is in volume 4, 20281, paragraph 257 in this statement of uncontested facts. Are you with me? I am. Okay. Paragraph 257. Yeah, 257. It says, from the perspective of the auctioneer and PADE staff using the automatic ringman, the system functioned the same in the simulated sale on May 24th as it did in the commercial sale on May 26th. Your Honor, that is evidence the judge looked at favoring Mannheim. But we've pointed out in our brief part of that evidence. So there's no genuine issue of material fact here. I think this is a statement of uncontested facts. It's not a question of whose page it is. My understanding is that that's part of a very lengthy document that begins on page 220,136. My understanding is this is Mannheim's auctions. I'm looking at the index. Mannheim Auctions replied to Plaintiff Auction Management Solutions' response to Mannheim's statement of material facts, not in genuine dispute. But this is Mannheim's response. It's Mannheim's response. Maybe I'm reading this the wrong way. But it looked to me like throughout this document you have each statement of material facts not in genuine dispute. And then you have AMS's response flag. Then you have Mannheim's reply flag. And many of these statements don't have either AMS's response or Mannheim's reply. And paragraph 257 is one of those, which I understood to mean that that was a statement of uncontested facts to which neither party had either a response or a reply. Your Honor, we have pointed out in our blue brief on A15410 and A15337, we point out the difference between the 24th and the 26th. This statement relies on paid witnesses. We pointed out in our brief that the paid witnesses did not measure reliability, did not measure time. The problem was with the May 24th. I think this is Mannheim's response. Maybe I'm mistaken. Let's assume this is a statement of uncontested facts. Where does that lead? Your Honor, if this is a statement of uncontested facts and if we have agreed with that, it sounds to me like there's a problem. But the fact is we state in our blue brief over and over again, particularly on the pages I mentioned, that in fact there were reliability problems on the 24th. They worked all night long into the 25th, into the 26th. It was only the 26th when they finally used an RUDP system that worked that they solved the problem. And going back to Judge Lurie's point, Mr. James had been working for one and a half years in this system. They had had failure after failure. They used TCP, which was too slow. They used UDP, which was unreliable. By the time they got to the 24th, he had had one and a half years of experience. The fact that finally they solved it. At some point, they've got to solve it. And at some point, they did solve it. They solved it the morning of the 26th. It did not work until then. And it seems to me, and our position— It worked. It did not. It just didn't work. It worked. It just didn't work, in your view, to satisfy the reliability and timing requirements that the claim requires. That is not so, Your Honor. The claims require two things. One, that the auctioneer has to be in complete control of the auction event, which requires both timing and reliability. And the auctioneer has to manage the psychology and pace of the auction, which requires timing. There's evidence saying that. So these shortcomings are directly related to claim limitations. You have to have reliability, and it can't be too late to satisfy these claim limitations. There's testimony supporting that. We submit that a jury should be—we should be entitled to have a jury verdict on whether or not we satisfy those claim limitations. It's not a question of whether Mannheim has evidence to the contrary. Is there direct testimony from some of your witnesses that on May 24th, the system was not reliable, that the auctioneer was unable to control the bidding on whatever happened on May 24th? Yes, there is. On Blue 17 and Blue 17 and 18, there is testimony that it did not work on the 24th. Because it needed the new software. Pardon? Because it needed the upgraded software. It needed—it needed upgraded software. Now, they claim that RUDP existed before that date, but the fact is, it didn't work. And there's testimony that, in fact, what was used on the 26th was not the same as what was used on the 24th. And a jury is entitled to evaluate whether or not there were—this thing was ready for patenting, whether or not it was enabled. I submit that there's a lot of evidence which we identify in the Bluebrief. On 16, it talks about the mock auction. And at bottom of 16, Speer testified the May 24th mock auction may have used the early TCB-based software. But the software did not include the RUDP development that allowed the auctioneer to control the auction, and therefore did not satisfy the claims. The system remained problematic as the paid auction approached. In the final hours prior to the auction, the system wasn't behaving, it wasn't working in a necessary sub-second environment, meaning it was too late at that point. The problems included failing to receive all intended network transmissions, which is a liability problem. And we cite page after page after page of the record to support that. The developers scrambled to reach stability, continuing to make changes to the source code. What about James' testimony at page 5,678 of the appendix? This is in volume 2. 5,678? 5,678. What testimony are you looking at? Okay, on page 5,678, this is James' testimony on page 287 of the transcript, lines 12 through 17. It's the question, when did you reach that conclusion that a RUDP-based implementation would provide better transmission speeds than the TCP solutions would answer? I don't know the date I reached that conclusion. The conclusion itself is sort of obvious to someone who's aware of the field. Your Honor, the simple answer to that is that's dealing with transmission speeds. They knew that going from TCP to UDP would improve transmission speeds because TCP was too latent. But the problem was RDP was not reliable. So this is only one part of the problem. They had to reach a point where they had both low latency and high reliability. They didn't reach that point until May 26. I know the district court relied on this, but he's looking at only one small smidgen of the total picture. Because it seems to me the question is whether the invention, the claimed invention, was complete enough, let's say on the 24th, to have enabled a person of ordinary skill in the art to finish it up with just an ordinary application of ordinary technical skill. Reading the record leaves me with the impression that the only thing left to do from the 24th of May to the 26th was essentially to get the kinks out, to debug the system and otherwise make it work, and that the system was essentially ready for patent on the 24th. Your Honor, that's a jury question. The question of whether or not you have undue experimentation includes the time involved as one of eight elements. It also includes predictability. It also includes the complexity of the subject matter involved. It also includes who the people are. There are eight separate elements in the Wands case. That's a jury issue. I'm not, if all you're doing is weighing the evidence and saying, I've read the evidence, in this case you've read the evidence, and you think that Mannheim has a pretty good case. Well, there are lots of cases like that where one side has a pretty good case, but that's what the jury system is all about. The jury is entitled to resolve those questions. In this case, the judge took the issue away from the jury and didn't permit us to have our day in court, and so that is the problem. And the other problem, you're well aware of, this dictionary light is on. We've asked you a lot of questions. We've given you a lot of time. We'll give you your bottle time in three minutes. All right. Good morning. May it please the Court. I'd like to start out by simply saying that there were a couple of questions addressed in Mr. Dunner that I think are answered in our brief. Before you get into that, can you shed any light on the question of whether this paragraph 257 on appendix page 20,281 is a statement of uncontested issue of facts? It is, Your Honor, and that's what I was going to address. That's in footnote one. We referenced more than just footnote one of the reserach, Your Honor. On page 10, we referenced more than just Georgia Local Rule 56.1. AMS was required to identify facts that asserted were genuinely disputed and its factual basis in our reply. They did so with respect to certain agreements. As you can see, they didn't do it in response to that. The uniform testimony from every participant, including professional auctioneers, that took part in the May 24th mock auction at bay was uniform, and it was consistent that the system worked the same way on the 24th as it did on the 26th. End of story. That fact is not disputed. Indeed, AMS concedes that a version of the software existed on May 25th that was an embodiment of the claimed invention. So these midnight mystery corrections to the code are irrelevant. AMS concedes that a claimed embodiment was reduced to practice on the critical date. So all these midnight changes are irrelevant. They don't create a genuine disputed material fact. The bottom line is the court in a well-reasoned comprehensive opinion found summary judgment on nine independent bases. That flowed from the court's well-reasoned claim construction only on 13 claim terms for which AMS doesn't appeal. This mock auction that took place on May 24th was not something that was half-baked. Pate had set out and invited hundreds of people to attend the May 26th auction. It had advertised the sale nationally for weeks. It had a cocktail party the night before. Pate's editor explained, and his testimony is unrebutted, that if Pate thought this was some sort of experimental system, he wouldn't have put on the sale. He had experience with this system for more than a year. Go back to May 1998. Pate had distributed installation software to remote bidders. Page A6502. They distributed user manuals. But what if Kingsport had worked out between May 24th and May 26th? There's no evidence of that, Your Honor. There's evidence from Mr. Spear that at various times there was bid transmission problems. Mr. Spear wasn't present on the 24th. There was no bidders present at the mock auction. There's no testimony and there's no expert opinion from AMS as to what occurred on the 24th. Yeah, but they could know what occurred after the 24th and before the 26th. Your Honor, AMS has no expert opinion as to what occurred on the 24th. They do have some Mr. Spear's testimony. It's not specific as to dates, number one. So it's not specific as to what occurred on the 24th. Peter Alexander. I'm interested in what occurred on the 25th. My view of the case is that something relevant happened between the 24th and the 26th. They've never been able to point that out, Your Honor. There were multiple versions of the code that were produced in discovery. One dated May 17th. One dated May 24th. One dated May 25th, which is the critical date, which AMS concedes is in violation of the claims. And then the code that was filed with the Patent Office. Our code expert looked at that and said it had all the same functionality. AMS has never pointed to a single line and said, there's where the functionality was that was at. We've put forward expert opinions that what was practiced on the 24th was an embodiment of the claims, a reduction of practice. But even if the court disagrees with that, the claims were ready for patenting long before that. The only thing that's required under robotics is a disclosure to a skilled artist. AMS, I know there's an issue about whether Mr. James was a one of ordinary skill in the art. AMS's expert on page 2151 and 52 says Mr. James was, quote, definitely, end quote, one of ordinary skill. So they viewed him as one of ordinary skill in the art. The definition of one of ordinary skill in the art in this case was somebody with a college degree in EE, computer science with several years of engineering and a computer networking experience. Mr. James was one of ordinary skill and he made changes. But the point is, there's no evidence of any disclosure that took place from the inventors to Mr. James. He's the only one that did any programming between the 24th and 26th. So this invention was ready for patenting long before the critical date. And there's no contention that there weren't commercial offers for sale. They go back all the way to January 1998 when AMS asked Mr. Spear, please develop the code. Mr. Spear could not quite read or write the code. He hired this high school student. There are a lot of issues seem to be here. Why shouldn't the jury decide that? There's no genuine dispute of material fact on whether the invention was ready for patenting before the critical date. Under robotics vision, that case is dispositive based on the summary judgment record and the undisputed facts. But in all fairness, there were things that occurred between May 24th and May 26th that had some impact. And there was activity that took place. So aren't we, shouldn't we be looking at it in the light most favorable to auction matter? They're not material for summary judgment purposes. There may have been modifications made, but they don't create a genuine dispute of material fact. AMS conceded to them. Your position being that it was just the exercise of routine matters within the skill of someone of ordinary skill in the art. That's correct. Indeed, Your Honor. Appendix Site A20246, paragraphs 206 and 207. Mr. James, the only person who wrote the code, described the work he was doing in the weeks leading up to May 26th as, quote, debugging. But as Mr. Dunder points out, if the claims really do require reliability and do have very serious time constraints involved in the full bidding system because bids are coming in, I don't know, where do we draw the line between what's akin and what really goes to what's been invented? Because the invention requires that there be reliability, does it not? No, Your Honor, I would not agree with that. I mean, it requires that the auctioneer be in control of everything that's going on, right? Indeed, AMS has proffered no expert opinion on the elements they claim are missing. An auctioneer managing the pace and psychology of the auction and an auctioneer being in control of changes in the state of the auction, their technical expert, Peter Alexander, said, I'm not, I don't have any expertise in that area. So the elements they rely on to establish some disputed issue of fact, they don't even have an expert opinion on. They did have an auctioneer expert who looked at infringement of the simulcast system, but he never looked at the prior art. They don't have an expert opinion on the two elements that they claim were missing from the prior art. Mr. Spear, again, wasn't present on May 24th, nor were any of the inventors. The mock auction participants, including professional auctioneers, said it worked exactly the same from the 24th through the 26th. Indeed, that's consistent with what AMS was telling the world way back in March of 98. This is what AMS told a large auction house in March of 98. While other potential competitors claim real-time, they have been unsuccessful in satisfying the true instantaneous requirements of this very demanding industry. AMS's demonstrations have met or exceeded all real-life performance requirements. That's from 6243 in appendix. They made a similar statement to Sotheby's in August of 98, in which they said that submission of bids from the remote audience to the auctioneer could take place in less than one second. There's no time element in the claims. When the claims were first filed, there was an element of instantaneously transmitting that was part of the original claims. That was canceled during the prosecution. There's no time element as part of the claims. All the testimony about all the demonstrations was that it worked reliably. Indeed, Page would not have had the sale had they not been satisfied. Indeed, going back to a mock auction that occurred in May of 1998, Kurt Madig, the general manager of Page, said he participated from his facility in York, Pennsylvania at Page. The mock auction took place in Columbus, Ohio at Columbus Fair. He measured the delay in the transmission of audio and video, concluding it was acceptable for me to sell to my customers. Who better to judge whether this worked than the actual people who were professionals in this business, whether it was sufficient to meet the claims. Again, NMS's expert offered no contrary opinion on this. At 820102, in response to a question in his deposition, he got voluminous reports, and they're in the appendix. But at his deposition, his testimony was very clear. Do you have any opinions on whether Version 1 of Online Brain Demand anticipated or rendered obvious the claims of the 612 patent? Answer, no, I do not. They don't have any expert opinion on the claim elements they claim are missing. There's a mountain of evidence suggesting an establishment that it was on sale, reduced to practice, and ready for patenting almost to a critical date. Finally, the failure to meet AMS's subjective business goals, they're not embodied in the claims, they're not an element of the claims. They may have wanted sub-second, they may have wanted perfect reliability. Microsoft wants the same thing, but doesn't stop Microsoft from rolling out software. This is software, and if this invention wasn't ready for patenting before the critical date, I submit robotics vision would be eviscerated. In terms of written description, Your Honor, we believe the court was also correct in concluding that the evidence was very clear in the original specification, and when they stated that they were not in possession of a TCP embodiment, they rewrote the specification in an effort to try to follow Mannheim's system. But the opinion that was proffered by Mannheim's expert was that skilled artisans reading that specification were ready. Is there a situation where there's a failure of written description in the prerogative that that would also preclude the invention being ready for patenting from May 24th? I don't believe so, Your Honor. I think they're independent. There might be a little bit of tension, Your Honor. But the fact is, the written description requirements, Judge, by the specification, and... If they didn't know enough to have an adequate written description, how could they have been ready for patenting early? Well, Your Honor, they had a TCP embodiment that was demonstrated over and over, and that's the one that was demonstrated in May of 1998, and everybody felt satisfied the requirements had put on an option. In May of 1999, when Mr. James was going through his freshman year exams, he rewrites the code to incorporate RDP. That's what went on, so it wasn't two years ago. Judge, is your point about written description that the claim was broader and didn't rely on a particular system? That's correct, Your Honor, but it's clear the inventors were not in possession of a TCP embodiment. That's something that the specification makes clear. Finally, I think the court was also correct in concluding that the simulcast system did not infringe for multiple reasons. Again, the claim description is clear. This is literal infringement, not doctrinal equivalence. It requires complete control. When a simulcast system accepts remote bids, the state of the auction changes. You have a new high bidder, a new high bid, and a new ask price, and that changes all without the control of the auctioneer. So, AMS makes arguments about what would happen in a traditional style live auction. Well, in a traditional style live auction, none of those changes occur without an auctioneer doing something. Accepting a bid, changing the item, asking a different ask price. When a remote bid comes in on the simulcast system, that's done outside of his control. Indeed, as we've identified in our brief, the red brief, automatic acceptance was this claim was part of prosecution. Indeed, it was part of Judge Story's claim construction to the extent that an auctioneer is subservient to bid algorithms, like automatic acceptance, the auctioneer is not in total and complete control. The claims require complete control. Unless the court has any further questions. I have to correct something I said about paragraph 257 on 20281. It's a loose question to me. Even if that is not opposed, it doesn't resolve the case. This says, from the perspective of the auctioneer and the paid staff using online agreement, we pointed out that the paid staff knew nothing and didn't testify about reliability, not testify about speed. Our evidence is from other witnesses. It's from other witnesses who didn't have to be at the auction because the software was not at the auction. It was at a server remote from the auction. They were able to tell that the software was not reliable and or too fast. So I don't think this paragraph resolves the question. As to what evidence we have, there's a ton of evidence from Rabinow, Speer, two of the inventors, from James, from Simmons, another one of the inventors. It's in the blue brief pointing out that all the way through up to May 24th and beyond, the system was either unreliable or it was not working, it was too slow. Mr. Collins mentions a robotics case. Robotics case does not govern this thing. That was a bench trial. The issue there was whether there was substantial evidence. The judge found that there was nothing left to do. So that doesn't solve anything. He talked about there's no expert opinion. We don't need an expert opinion on the ultimate issue. There were opinions that were reliable on whether time was important or whether reliability was important. And we have a ton of testimony from non-experts on the fact that it wasn't reliable, that there wasn't time. As to enablement and written description, I apologize for talking so quickly, but I'm trying to keep up with Mr. Collins. The fact is that the case that we have cited, the in vitro gym, makes it clear that when you have two methods of carrying out the same invention, you don't need to cite them both. On the infringement thing, I think I've run out of time. Maybe I have 40 seconds left. I think you were trying to keep up with the clock, not Mr. Collins. The gavel hasn't come down on this. On the infringement issue, the control, they rely on automatic operation. The fact is there was an undo bid button. There was a delete bid button. The auctioneer was in complete control. He could reject. He could accept. And the patent itself talks about automatic operation. The prosecution history itself talks about automatic operation. So that is not an event. The judge found that there was no evidence that the techniques increased the potential sales in the case. Well, the fact is there's a ton of evidence from Mannheim's experts, from our experts, from our auctioneer's experts, and from a paid, a former paid auctioneer. I think I've extended my, overextended my welcome. Thank you, Mr. Donner. As an extended group, you're in control. This is the case under revising. Thank you both.